Del Buono, Jr., *v.* Pennsylvania Labor Relations Board, Appellant.

646

Argued April 21, 1952. Before Drew, C. J., Stern, Stearne, Jones, Bell, Chidsey and Musmanno, JJ.

*George L. Reed,* Solicitor, with him *Robert E. Woodside,* Attorney General, and *M. Louise Rutherford,* Deputy Attorney General, for appellant.

*Henry D. O'Connor,* with him *Joseph W. O'Connor,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, May 26, 1952:

We are not in accord with the conclusion of the court below in this case that there was no legal basis for the findings and the order of the Pennsylvania Labor Relations Board. Having in mind that "it is the function of the board not only to appraise conflicting evidence, to determine the credibility of witnesses, and to resolve primary issues of fact, but also to draw inferences from the established facts and circumstances", (*Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* 345 Pa. 398, 400, 29 A. 2d 90, 92), and that, upon judicial review, "the findings of the board as to the facts, if supported by substantial and legally credible evidence, shall . . . be conclusive", (Act of June 1, 1937, P.L. 1168, section 9(b), as amended by the Act of June 9, 1939, P.L. 293), it is clear that the court was not justified in setting aside the order of the Board.

Mar-Lo Manufacturing Company, a co-partnership composed of Nicholas Del Buono, Jr. and Michael Del Buono, and engaged in the manufacture of chrome and

wooden furniture, employed nine production workers together with a foreman. The Furniture, Casket and Allied Workers Union, Local 37, A. F. of L. filed with the Pennsylvania Labor Relations Board charges against the Company of unfair labor practices, alleging that four of their employes were discharged because they had refused to withdraw their authorization to the Union to represent them, and also that the Company had failed to comply with a request of the Union to negotiate a contract. Thereupon the Board filed a complaint against the Company embodying these charges and alleging coercion of their employes in the exercise of their rights to join a labor organization and to bargain collectively through representatives of their own choosing. After taking elaborate testimony the Board made findings of fact and entered an order directing the Company to cease and desist from interfering with the employes in the exercise of their rights of self-organization and collective bargaining and from discriminating against them because of their membership in the Union and activities in its behalf; ordering the Company to offer three of the discharged employes reinstatement to their former positions (the fourth having already been reemployed) and to pay back wages equal to the amount they would have earned from the date they were discharged to the date of such offer of reinstatement, less the amounts actually earned by them or the losses wilfully incurred by them during said period; and ordering the Company also to bargain collectively with the Union with respect to wages and other conditions of employment.

At the hearings before the Board there was competent testimony to the effect that when an employe named Andreol commenced organizational activities among the employes he was summoned to the office of the Company and promised a raise in wages if he would

not "start anything". However, the nine production employes signed cards accepting membership in the Union and authorizing it to act for them as a collective bargaining agent in all matters pertaining to wages and other conditions of their employment. Upon the Company's receiving a letter from the Union requesting the naming of a time and place for a meeting to negotiate a labor agreement Nicholas Del Buono assembled all the employes and told them that five of them would have to go because he could not pay the Union wages; he asked each of them whether they wanted a union and they all replied in the affirmative. Thereafter one of the employes named Terrinoni, obviously acting by authority and direction of the Company, called the employes to the office, one at a time, and urged them to sign a memorandum stating that they did not wish to be represented by the Union; in at least one instance a raise in wages was held out as an inducement. The next day Nicholas Del Buono spoke to four of the employes, Andreol, Scarlata, Popolo, and Pizzelli, endeavoring to discourage them from joining the Union, and suggesting the possibility of a raise for them in wages. He said they could not go back to work until they came to an agreement, which they understood as meaning that they must renounce the Union's representation of them as their collective bargaining agent; he told them that the majority of the employes had signed the memorandum, that he wanted them also to sign it, and that he would not let them go back to work until they did sign it. There was testimony to the effect that he tried to bring pressure upon two of them who were working under the G. I. bill by threatening to stop their pay checks from the Veterans' Administration, and he did in fact write to the Veterans' Administration to that end. The four employes refused to sever their membership in the Union and began to picket the

Company's place of business. Subsequently Pizzelli, induced by an increase in his wages, returned to work, but the other three remained out. Two weeks after receiving the letter from the Union requesting a meeting the Company replied that a majority of the employes had signed the memorandum expressing their desire not to be represented by the Union and therefore the Company would not agree to enter upon negotiations with it for a collective bargaining contract.

As against the evidence thus referred to, the court below rested its decision largely upon testimony that Nicholas Del Buono told the employees he had nothing against the Union and they had the right to join it if they wished to do so. Such protestations, however,— obviously mere lip service—must be appraised in the light of his attitude in seeking, by both threats and inducements, to have them renounce their connection with the Union. While he did not expressly state to any of them that they were discharged, he did tell the four of them, according to testimony which the Board justifiably accepted as credible, that they could not return to work unless they countermanded their authority to the Union to represent them. No set words are necessary to constitute a discharge; if permission to remain in employment is granted upon a condition which violates the Labor Relations Act and which an employe is therefore not bound to accept, this constitutes a constructive discharge which is just as effective as if formulated in express language. As the Board stated in its final decision: "The theory of a constructive discharge rests entirely upon the good faith attitude of the parties, and not in their actual words or deeds. We are convinced that Scarlata, Popolo and Andreol did not return on the following day because they believed that unless they signed the agreement to renounce the union they would not have been

permitted to work. Consequently the employer's action was equivalent to a discharge."

While it is true, as stated in *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* 345 Pa. 398, 403, 29 A. 2d 90, 93, that an employer has an unlimited right to discharge employes in order to reduce expenses, in the present case the Board was well justified in inferring that the Mar-Lo Company had no bona fide intention of actually continuing its business with only five of its employes and that its real object was merely to avoid paying the higher wages which might result from a collective bargaining agreement with the Union. As a matter of fact, according to the admission of Nicholas Del Buono, the Company promptly, after the discharge of Andreol, Scarlata and Popolo, hired three more men; he sought to explain this by the lame statement that they had "different positions". In the *Kaufmann* case, although several years had elapsed since the discharge of some of the employes, no others had been employed to replace them.

The law is well settled that, nine of the ten employes having become members of the Union and the Union having requested a meeting for the purpose of negotiating a collective bargaining agreement, the Company could not thereafter refuse compliance on the ground that it had meanwhile succeeded in obtaining a majority of the employes to revoke their authorization of the Union to represent them. Such a plea has been uniformly rejected as being based upon an unfair labor practice: *National Licorice Co. v. National Labor Relations Board,* 309 U. S. 350, 357; *National Labor Relations Board v. Bradford Dyeing Association,* 310 U. S. 318, 339, 340\*; *Medo Photo Supply Corp.;*

---

\* Incidentally, it was said in that case that the National Labor Relations Act was applicable even though the employer's business was small in comparison with the industry to which it belonged.

*v. National Labor Relations Board,* 321 U. S. 678, 687; *Oughton v. National Labor Relations Board,* 118 F. 2d 486, 490; *Western Cartridge Co. v. National Labor Relations Board,* 134 F. 2d 240, 244; *National Labor Relations Board v. Crown Can Co.,* 138 F. 2d 263, 267. In the *Medo Photo Supply Corporation* case it was held that an employer cannot ignore a Union as the employes' bargaining representative by negotiating with them individually and inducing them to abandon the Union by promising them higher wages. It was there said (p. 687) : "Petitioner cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the union no longer had the support of a majority. It cannot thus, by its own action, disestablish the union as the bargaining representative of the employees, previously designated as such of their own free will. . . . Petitioner's refusal to bargain under those circumstances was but an aggravation of its unfair labor practice in destroying the majority's support of the union, and was a violation of §§8(1) and (5) of the Act." And in the *Western Cartridge Company* case, it was stated (p. 244) that interference with the employes in the exercise of their rights "is no less interference because it is accomplished through allurements rather than coercion."

In section 8(c) of the Labor Relations Act of 1937, as amended, it is provided that the Board shall "take such reasonable affirmative action, including reinstatement of employes discharged in violation of clause (c) of subsection (1) of section six of this act with or without back pay, as will effectuate the policies of this act." The Board found that the Company violated, inter alia, clause (c) of subsection (1) of section six of the act, and therefore was justified in ordering rein-

statement; its order was in substantial conformity with our rulings in *United Retail Employees of America, Local No. 134, v. W. T. Grant Company, Inc.*, 341 Pa. 70, 17 A. 2d 614, and *W. T. Grant Company, Inc., v. United Retail Employees of America, Local No. 134*, 347 Pa. 224, 31 A. 2d 900. From any payments of back wages to be made to these discharged employes there must be deducted not only all amounts earned by them since their discharge but also any that could have been earned had they reasonably sought other employment. As stated by Mr. Justice PARKER in the latter of those cases (p. 227, A. P. 901): "it was not the intention of the legislature that one who is deprived unlawfully of his employment should be maintained in idleness when he has an opportunity to do work for which he is fitted. The employee is bound to use reasonable efforts to find work and keep employed. This is the same rule that is applied to a discharged employee who sues for a breach of contract." Moreover, if the business of the Mar-Lo Company has since diminished and the number of its employes has been reduced because a larger force was not required to meet its needs, such circumstances should be taken into account in determining the period during which these employes would normally have been employed had they not been discharged in violation of the Labor Relations Act.

The decree is reversed, the order of the Labor Relations Board is reinstated, and the record is remanded to the court below with direction to refer the case back to the Board to determine the amount of wages due the discharged employes in accordance with the principles herein stated; appellees to pay the costs.