Pennsylvania Labor Relations Board *v.* Fortier, Appellant.

248

Argued October 8, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

reargument refused April 27, 1959.

*Donald B. Heard,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*James F. Wildeman,* Assistant Attorney General, with him *Yale B. Bernstein,* Assistant Attorney General, and *Thomas D. McBride,* Attorney General, for Pennsylvania Labor Relations Board, appellee.

OPINION BY MR. JUSTICE BELL, March 20, 1959:

This is an appeal from the Order of the County Court of Allegheny County which dismissed a petition for a review of the Order of the Pennsylvania Labor Relations Board directing that an employee be reinstated by her employer with back pay.

The employer, Charles H. Fortier, operates two industrial cafeterias in Coraopolis, Pennsylvania. The employee, Lydia M. Zimmer, was a counter girl at Plant No. 2 for several years and then worked at the same position at Plant No. 1. In September 1956, she was transferred from Plant No. 1 back to Plant No. 2. While at Plant No. 2 she became involved in a dispute with another employee, Pearl Pusatori. As a result of this argument, Mrs. Zimmer was transferred back to her old job at Plant No. 1 and she resumed her duties there on October 21, 1956. On October 22, 1956, there was a wildcat strike by the employees of Fortier in which she participated. The Union admitted that this was a wildcat strike. The Board found, based upon Mrs. Zimmer's own testimony, that later that day she refused an offer of her old job at Plant No. 1. The strike was eventually settled and all the employees except Mrs. Zimmer were called back to work.

There was no claim by the Union that Mrs. Zimmer had the right to be reinstated to a job in Plant No. 2, nor was any grievance filed by Mrs. Zimmer or her Union, as required by the collective bargaining agreement.

After a hearing in which both the employer and employee presented evidence, the Board found:

"17. That Lydia M. Zimmer did not return to work on October 29, 1956, because when she spoke to the Respondent's attorney, at the Respondent's request, she was informed that she was discharged because she called the strike and walked off the job.

"18. That the respondent informed the Bureau of Employment Security that Lydia M. Zimmer was discharged because there was a 'wildcat strike' and she was the stewardess, (although it was not certain that she had told the other employes to strike.)"

There is substantial and legally credible evidence to support these findings, as well as the Board's find-

ing that Mrs. Zimmer on the morning of the strike refused an offer of her old job at Plant No. 1, and these findings must therefore be sustained.

However, the Board erroneously concluded (1) that the strike was not in violation of the Act or of the collective bargaining contract, and (2) that the employer was guilty of an unfair labor practice in that he violated §6, subsection 1, clause (a) and clause (c) of the Pennsylvania Labor Relations Act of June 1, 1937, P.L. 1168, 43 PS §211-6, which read as follows: "(1) It shall be an unfair labor practice for an employer—(a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act. . . (c) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . ."

The scope of our review of the Board's findings and conclusions is ably stated by Mr. Justice (later Chief Justice) STERN in *Pa. Labor Relations Board v. Kaufmann Dept. Stores, Inc.,* 345 Pa. 398, 29 A. 2d 90. In that case this Court reversed a finding of the Board that an employee named Richards had been discharged in violation of the Pennsylvania Labor Relations Act and was entitled to be reinstated with back pay. The Court said (pages 399-401, 401-402) : "We approach consideration of the case with full realization of the limited scope of appellate review in such a proceeding. The amendatory act of June 9, 1939, P.L. 293, section 9(b), provides that 'the findings of the board as to the facts, if supported by substantial and legally credible evidence, shall . . . be conclusive.' This means that it is the function of the board not only to appraise conflicting evidence, to determine the credibility of witnesses, and to resolve primary issues of fact, but also to draw inferences from the established facts and cir-

cumstances: National Labor Relations Board v. Nevada Consolidated Copper Corporation, 62 Sup. Ct. Rep. 960; Agwilines, Inc. v. National Labor Relations Board, 87 Fed. 2d 146, 151; National Labor Relations Board v. Moore-Lowry Flour Mills Co., 122 Fed. 2d 419, 422. Upon judicial review, however, it is the duty of the court to determine whether the findings of the board are supported by the substantial and legally credible evidence required by the statute and whether the conclusions deduced therefrom are reasonable and not capricious. All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229. 'Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established': National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300. 'The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power': National Labor Relations Board v. Thompson Products, Inc., 97 Fed. 2d 13, 15; National Labor Relations Board v. Union Pacific Stages, Inc., 99 Fed. 2d 153, 177. 'Suspicion may have its place, but certainly it cannot be substituted for evidence': Union Trust Co. of Pittsburgh's Petition, 342 Pa. 456, 464, 20 A. 2d 779, 782. . . .

"It is, of course, true, and is conceded by all, that, notwithstanding the Labor Relations Act, *an employer*

*retains the right, subject to a single exception, to discharge his employes or any of them for cause, or, in the absence of a contractual obligation to the contrary, for no cause at all:** National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 46; Associated Press v. National Labor Relations Board, 301 U.S. 103, 132; Phelps-Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 186, 187; Jefferson Electric Co. v. National Labor Relations Board, 102 Fed. 2d 949, 957. The act was not intended to empower the board to substitute its judgment for that of the employer in the hiring or discharge of employes, nor to vest in the board any managerial authority: National Labor Relations Board v. Union Pacific Stages, Inc., 99 Fed. 2d 153, 177. The only limitation upon the right of the employer to discharge an employe is that he may not, under cover of such right, interfere with, restrain or coerce his employes in the exercise of their rights of self-organization and collective bargaining nor discriminate against them because of union activity, in violation of the provisions of the act."

We agree with the employer that the strike was in violation of the collective bargaining agreement and therefore was unprotected activity: *National Labor Relations Board v. Reynolds International Pen Co.*, 162 F. 2d 680; *National Labor Relations Board v. Dorsey Trailers*, 179 F. 2d 589. It is true, as the Board contends, that the agreement does not contain an express no-strike clause. However, the collective bargaining agreement made on June 30, 1955, between the employer and the Hotel and Restaurant Employes Union as the duly authorized and sole collective bargaining agent for the employees of the employer, ran until June 30, 1957. It provided, inter alia, in §2: "This

---

* Italics throughout, ours.

agreement shall not be construed as justifying an interference by the Union with reasonable employee discipline by the Employer and with the efficient conduct of business." It provided in Article 20 for a temporary cessation of the agreement in case of an *authorized* and/*or ratified* dispute over wages, hours, working conditions or recognition of the Union, and upon reinstatement thereof upon the settlement of such dispute between the employer and the Union. In view of these provisions, it is untenable, if not absurd, to assert that the employees can strike at any time one or more of them may desire, over any grievance—real or imaginary. One of the main purposes of and reasons for a collective bargaining contract is to stabilize industrial relations and insure labor stability for the duration of the agreement; in other words, (a) the right to have grievances settled amicably and peaceably, and (b) freedom from strikes or work stoppages for the duration of the agreement. As the Supreme Court recently said in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 454, (quoting with approval from a Senate Report) :

" 'If unions can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. The execution of an agreement does not by itself promote industrial peace. The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract.' "

The Pennsylvania Labor Relations Act* was passed to promote industrial peace. It cannot possibly be suc-

---

* Act of June 1, 1937, §2.

cessfully contended that so-called wildcat strikes promote or even contribute to industrial peace. Therefore, to place this employee under the protective mantle of the Act perverts the very purpose of the Statute by protecting those persons whose actions disrupt the industrial peace of the Commonwealth.

In *Teamsters v. Mead*, 230 F. 2d 576 (1956), Judge MAGRUDER said (pages 583-584) : "As stated by Chief Judge PARKER in United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F. 2d 872, 876-77, certiorari denied 1955, 350 U.S. 847, 76 S. Ct. 87 [28 Labor Cases, Para. 69, 316] : 'It is argued that a strike could not constitute a breach of a contract which did not contain a no strike clause; but we think it clear that the purpose of the contract was to require the settlement of disputes and grievances by a procedure which would not cause a disruption of business that would necessarily result from a strike and that a strike without following such procedure was necessarily a breach.'

"We think such was in effect the decision in N.L.R.B. v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S. Ct. 508, 83 L. Ed. 682 [1 Labor Cases, Para. 17,044] where a strike was deemed to be a breach of a collective bargaining agreement which did not contain an express no-strike clause, and thus was not a protected collective activity, *with the consequence that action by the employer in discharging such strikers was held not to be an unfair labor practice* under §3 (3) of the National Labor Relations Act. To the same effect see N.L.R.B. v. Dorsey Trailers, Inc., 5 Cir., 1950, 179 F. 2d 589 [17 Labor Cases, Para. 65,574]."

It is clear that this outlaw strike, which was actively participated in by Mrs. Zimmer, was a violation of the collective bargaining agreement which was entered into by the employer and the union in behalf of

all the employees, and therefore all the strikers were subject to the employer's refusal to reinstate them: *Labor Board v. Sands Mfg. Co.*, 306 U.S. 332; *National Labor Relations Board v. Reynolds International Pen Co.*, 162 F. 2d, supra; *National Labor Relations Board v. Dorsey Trailers, Inc.*, 179 F. 2d, supra. Cf. also: *Pennsylvania Labor Relations Board v. Kaufmann Dept. Stores, Inc.*, 345 Pa., supra.

Where an employer has a lawful right to re-engage all or to refuse to re-engage any illegally striking employees, can he re-engage some, without re-engaging all?

The Supreme Court has answered this question— an employer has a lawful right to re-engage or reinstate those persons whom it desires and to refuse to re-engage or reinstate some or all or any contract-breakers, and such action would not be an unfair labor practice. In *National Labor Relations Board v. Sands*, 306 U.S. 332, the N.L.R.B. found that the employer had refused to bargain collectively with representatives of its employees, and had discriminated with regard to hire and tenure of employment, and had discouraged membership in a labor organization, and had interfered with, restrained and coerced its employees in collective bargaining; and that these actions constituted unfair labor practices in violation of §8(5), §8(3), §8(1) and §7, respectively, of the Act. The Supreme Court reversed and held these findings were unsupported by the evidence. The employer had a contract with a union representing its employees which gave it the right to operate its plant on the basis of "departmental seniority". *It did not contain a no strike clause.* The union, in violation of the agreement, demanded that the employer abandon "departmental seniority" or shut down its plant. The employer chose the latter course, and then hired other workmen to take the place of those members of the union who had demanded an end to

"departmental seniority". The Court sustained the employer's actions and said (pages 344, 345) :

". . . It was at liberty to treat them as having severed their relations with the company because of their breach and to consummate their separation from the company's employ by hiring others to take their places. The Act does not prohibit an effective discharge for repudiation by the employe of his agreement, any more than it prohibits such discharge for a tort committed against the employer. . . .

"The offering of re-employment to four of the old employes, upon a new and different basis, is said to constitute discrimination against 'Mesa,' but the answer is that if the whole body of employes had been lawfully discharged the law does not prohibit the making of individual contracts with men whose prior relations had thereby been severed."

Appellee correctly contends that the above quoted sections of the Act prohibit the employer (a) from discriminating against an employee in order to discourage union membership, and (b) from coercing or restraining his employees in the exercise of their rights under the Act. However, the action of the employer in this case did not contravene either section of the Act. The employer did not refuse to reinstate Mrs. Zimmer to discourage union membership, or because of her *lawful* union activities, nor did he seek in any way to restrain or coerce his employees in the exercise of any rights which they were given by the Act. The employer re-engaged or reinstated all of the strikers who were members of the union except Mrs. Zimmer. The only action taken by the employer in this case was the refusal to re-engage an employee whom he considered a trouble maker and the leader of an admittedly illegal strike. What is the use of giving, by Act, members of a union special privileges and immunities if a member

of the union can with impunity violate a contract made pursuant to the Act and then claim the protection which the Act gives to those who comply with its terms? We repeat: Neither the illegal strike, nor Mrs. Zimmer as a contract violator, were protected by the Act. See cases hereinabove cited.

The Order of the Court below is reversed.

Mr. Justice MUSMANNO and Mr. Justice COHEN dissent.

Mr. Justice McBRIDE took no part in the consideration or decision of this case.