Pennsylvania Labor Relations Board, Appellant, *v.* Sand's Restaurant Corporation.

480

Argued November 30, 1967. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*James F. Wildeman,* Assistant Attorney General, with him *William C. Sennett,* Attorney General, for Pennsylvania Labor Relations Board, appellant.

*Samuel P. Lavine,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, April 16, 1968:

This litigation presents but a single issue: are the findings of the Pennsylvania Labor Relations Board [hereinafter the Board] supported by the statutorily required standard, i.e., by "substantial and legally credible evidence." Pennsylvania Labor Relations Act, Act of June 1, 1937, P. L. 1168, §9, as amended, 43 P.S. §211.9(b); see generally, *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* 345 Pa. 398, 29 A. 2d 90 (1942). Upon union complaint, a proceeding was instituted against appellee Sand's Restaurant charging violations of §6(1)(a) and (c) of the Labor Relations Act: "(1) It shall be an unfair labor practice for an employer—(a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act. . . . (c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization: . . ." Act of June 1, 1937, P. L. 1168, §6, as amended, 43 P.S. §211.6(1)(a) and (c).[1]

---

[1] Both the standard of judicial review and the requirements for an employer unfair labor practice under our Act and the National Labor Relations Act are in the context of this case substantially identical. Compare 29 U.S.C. §160(e) and 29 U.S.C. §158(a)(1) and (3). Reference to the decisions of federal courts, although not binding on this Court, is certainly appropriate. See, e.g., *Pennsylvania Labor Relations Board v. Fortier,* 395 Pa. 247, 150 A. 2d 122 (1959); *Pennsylvania Labor Relations Board v. Sansom House Enterprises, Inc.,* 378 Pa. 385, 106 A. 2d 404 (1954); *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* supra.

The basic facts are not in dispute. Between Thursday, March 11, 1965 and Saturday, March 13, 1965, ten of the fourteen employees of Sand's Restaurant were either discharged or voluntarily terminated their employment. The Board concluded that five of these employees were discharged under circumstances violative of the Labor Relations Act and thus ordered that they be reinstated with the usual back pay order; the other five, according to the Board, voluntarily terminated their employment. Only the employer appealed the Board's decision to the Philadelphia Court of Common Pleas. A reversal of the Board's action was obtained, the court holding that the administrative agency's findings lacked the requisite evidentiary support.[2] The Board then prosecuted this appeal.

At approximately 8:00 a.m., March 11, Sydney Hetelson, president of appellee corporation, received an anonymous telephone call at his home informing him that a number of his employees had signed cards evidencing an intention to unionize. One half-hour later Hetelson telephoned the restaurant; the call was answered by Katherine King, one of the allegedly discharged employees. Hetelson asked Miss King whether she had signed a card and received a negative answer. He then told her that he knew the names of those employees desiring to join a union and that she was to inform the other employees that, if they had signed a union card, they would be fired. According to Miss King's testimony, Hetelson insisted that he would

---

[2] The Board, in addition to back pay orders covering five employees, issued the standard order requiring the employer to cease and desist from violating §6(1)(a) of the Act and to post notices to that effect. The record leaves unclear whether the common pleas court reversed only the back pay orders or the cease and desist order as well. Since we have decided, see text infra, that four of the five employees were discharged in violation of the Act, the cease and desist order should be reinstated.

rather go out of business than permit unionization and that he planned to inform each of his employees of this intention.

Hetelson arrived at the restaurant at 11:00 a.m. He thereupon spoke to several employees, questioned each as to whether they had signed a union card and told each that, if they were not satisfied with their salaries or working conditions, they could leave, adding that "the door swings both ways." The record thus amply supports the Board's finding that the employer, Hetelson, displayed a strong anti-union animus.[3] The dispositive issue is whether, on this record, the Board could permissibly infer that five of the employees were discharged as a means of discouraging "membership in any labor organization." There is, however, one preliminary determination—although it is undisputed that three of the five (Laura Graves, Robert Myers and Viola Stewart) were discharged by Hetelson, the employer insists that Katherine King and Bernice McKnight voluntarily terminated their employment.

Unless the record supports a finding of constructive discharge, to support its back pay order the Board must find an actual discharge, rather than merely a termination of employment in anticipation of the employer's contemplated action. See Act of June 1, 1937, P. L. 1168, §8, as amended, 43 P.S. §211.8(c). A constructive discharge occurs only where the employer

---

[3] Under the National Labor Relations Act there are some employer unfair labor practices which are so "inherently destructive of employee interests" that the employer action is deemed proscribed without any need for proof of an underlying improper motive. See, e.g., *National Labor Relations Board v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S. Ct. 1792 (1967). We need not treat the applicability of such a doctrine to the Pennsylvania Labor Relations Act for the simple reason that this record contains sufficient evidence to demonstrate the existence of an underlying motive to discourage unionization.

makes working conditions so intolerable that the employee is forced to resign. See, e.g., *National Labor Relations Board v. Saxe-Glassman Shoe Corp.*, 201 F. 2d 238 (1st Cir. 1953) ; *National Labor Relations Board v. Chicago Apparatus Co.*, 116 F. 2d 753 (7th Cir. 1940). Such conditions have not been demonstrated in this litigation; an actual discharge on the part of the employer must therefore be demonstrated.

Mrs. McKnight testified that, when she arrived for work on Friday morning, James Burton, the cook, informed her that she had been fired because Hetelson had received a card bearing her name. She refused to leave stating that only Hetelson could terminate her employment. Hetelson, upon his arrival, told Mrs. McKnight that he was informed that she had joined a union. She replied that she did not understand what Hetelson was talking about but that Hetelson had fired other employees yesterday and that Burton had told her that she had been fired. Hetelson made no reply; Mrs. McKnight then said: "Just make up my money and give it to me." Hetelson complied, his reply consisting of the sole comment that he did not know what he had done to deserve all this. We believe that the Board correctly concluded that Hetelson's failure to inform Mrs. McKnight that she was not fired and that Burton was not expressing Hetelson's wish placed him in the position of ratifying Burton's statement and in effect discharging Mrs. McKnight.[4]

---

[4] We do not here hold that Burton was an "employer", i.e., "any person acting, directly or indirectly, in the interest of the employer," within the definition of that term in the Act. See Act of June 1, 1937, P. L. 1168, §3, as amended, 43 P.S. §211.3 (c) ; cf. *Pennsylvania Labor Relations Board v. Cadman*, 370 Pa. 1, 87 A. 2d 643 (1952). The Board's finding that Burton had no supervisory authority or authority to fire employees is not disputed. However, we do not believe that Hetelson could stand mute in face of Mrs. McKnight's statement that Burton told her she was fired without in effect ratifying Burton's statement.

The alleged discharge of Miss King occurred under similar circumstances. She was informed by Burton that she was fired and, when Hetelson arrived, she asked for her pay. However, there is nothing in the record to demonstrate that as to Miss King, Hetelson knew of Burton's statement. Simply, on this record, Miss King anticipated what she believed would be Hetelson's action; under these circumstances, she was not discharged, and as to Miss King the court below correctly reversed the Board.

Since the employer did not tell any employee that he or she was fired because of union activity, the Board must infer that the discharges were designed to curtail union activity.[5] We thus must decide whether this inference can find "substantial and legally credible" evidentiary support. This test has been most fully articulated in the often quoted *Kaufmann* opinion (345 Pa. at 400, 29 A. 2d at 92): "This [the substantial evidence test] means that it is the function of the board not only to appraise conflicting evidence, to determine the credibility of witnesses, and to resolve primary issues of fact, *but also to draw inferences from the established facts and circumstances:* [citations omitted]. Upon judicial review, however, it is the duty

---

[5] Hetelson offered no reason to support his actions vis-a-vis King and McKnight, contending that these two individuals quit. He stated that Stewart was discharged because she was too attractive and thus caused "too much carrying on" in the kitchen; that Graves was discharged because she was pregnant; and that Myers was discharged because he planned to leave in three weeks and a replacement was now available. Although the employees bear the burden of demonstrating that their discharges were for the purpose of discouraging union activity, the trial examiner may, we believe, reject the employer's justification for the discharges on the basis of credibility alone. See *National Labor Relations Board v. Walton Manufacturing Co.*, 369 U.S. 404, 82 S. Ct. 853 (1962), reversing *National Labor Relations Board v. Tex-O-Kan Flour Mills Co.*, 122 F. 2d 433 (5th Cir. 1941).

of the court to determine whether the findings of the board are supported by the substantial and legally credible evidence required by the statute and whether the conclusions deduced therefrom are reasonable and not capricious. . . . 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': [citation omitted]." (Emphasis supplied.)

*Kaufmann* makes clear that our relationship to the Board is not identical to our review of an inferior judicial tribunal. As the Supreme Court has long recognized, effect must be given to the expertise of an administrative agency: "An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration. [Citations omitted.] In these cases we but restated a rule familiar to the law and followed by all fact-finding tribunals—that it is permissible to draw on experience in factual inquiries."[6]

Both the Board and its trial examiner, evaluating the employer's strong anti-union animus, the timing of the discharges and the credibility of the employer's reasons therefor, inferred that the discharges were de-

---

[6] *Radio Officers' Union v. National Labor Relations Board*, 347 U.S. 17, 48-49, 74 S. Ct. 323, 340 (1954), quoting in part from *Republic Aviation Corp. v. National Labor Relations Board*, 324 U.S. 793, 800, 65 S. Ct. 982, 986 (1945).

signed to curtail unionization of the employees. A long line of our cases, as well as those of the federal courts, establish the rule that a discharge of employees following closely on the heels of an employer display of anti-union animus combined with an insubstantial employer explanation for these discharges is a sufficient evidentiary foundation for a finding that the employer has committed an unfair labor practice. See *Pennsylvania Labor Relations Board v. Cadman,* 370 Pa. 1, 87 A. 2d 643 (1952) ; *Chapin v. Pennsylvania Labor Relations Board,* 356 Pa. 577, 52 A. 2d 568 (1947) ; *Max Pisarev Co. v. Amalgamated Meat Cutters,* 345 Pa. 123, 27 A. 2d 52 (1942) ; *National Labor Relations Board v. City Transportation Co.,* 303 F. 2d 299 (5th Cir.), cert. denied, 371 U.S. 920, 83 S. Ct. 288 (1962) ; *National Labor Relations Board v. Empire Manufacturing Corp.,* 260 F. 2d 528 (4th Cir. 1958). Hetelson's statements can leave little doubt that he was strongly anti-union; three of the employees (Graves, Myers and Stewart) were discharged on March 11, the same day most of the anti-union statements were made and the fourth (McKnight) on the following day; each of the reasons offered by the employer to justify these discharges, see footnote 5, supra, involved conditions which existed well prior to the discharges. Under these circumstances our cases dictate that the Board's conclusion that the employer violated §6(1)(c) of the Act is supported by substantial and legally credible evidence.

The employer insists, however, that *Pennsylvania Labor Relations Board v. Sansom House Enterprises, Inc.,* 378 Pa. 385, 106 A. 2d 404 (1954) requires a contrary conclusion. The employee in *Sansom House* was discharged immediately following a four-day absence from work and the employer anti-union statements *followed* the discharge. We there carefully distinguished this factual pattern from the one here pre-

sented (378 Pa. at 392, 106 A. 2d at 408) : "The time sequence of union activity and discharge which was such an important consideration in the above cases. [*Cadman, Chapin, Max Pisarev Co.* and others] is not present here; . . ." We thus conclude that *Sansom House* is not, as the Court expressly recognized in that opinion, applicable to employee discharges which are preceded by employer expressions of anti-union animus.

We agree with the employer that, as to two of the discharged employees, the Board's order must be modified. Both Graves and Myers testified that they intended to leave Hetelson's employ at the end of March. The Board, however, awarded both employees back pay for a period extending beyond the end of March. Back pay awards must be designed to effectuate the policies of the Act. See Act of June 1, 1937, P. L. 1168, §8, as amended, 43 P.S. §211.8(c). For example, a wrongfully discharged employee is bound to use reasonable efforts to find work and, if he does not do so, wages he could have earned are deducted from his back pay award. See *W. T. Grant Company, Inc. v. United Retail Employees,* 347 Pa. 224, 31 A. 2d 900 (1943). An employee discharged in violation of the Act is entitled only to back pay for the period he normally would have been employed had he not been wrongfully discharged. *Crivelli Bros. Coal and Builders Supplies, Inc. v. Pennsylvania Labor Relations Board,* 385 Pa. 1, 122 A. 2d 32 (1956) ; *Del Buono, Jr. v. Pennsylvania Labor Relations Board,* 370 Pa. 645, 89 A. 2d 323 (1952). We thus believe that this back pay award extending beyond the period these employees would otherwise have been employed must be modified. On this record, it cannot be determined precisely how long Graves and Myers would have been employed by Sand's Restaurant and this litigation must be remanded to the Board for that determination.

As to King, the order of the Court of Common Pleas of Philadelphia County is affirmed; as to McKnight and Stewart, the order of the court of common pleas is reversed and the order of the Pennsylvania Labor Relations Board is reinstated; as to Graves and Myers, the order of the court of common pleas is reversed, the order of the Board is vacated and the record remanded for disposition consistent with this opinion.

Mr. Chief Justice BELL. took no part in the consideration or decision of this case.

***

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE COHEN:

I agree with the majority that as to McKnight and Stewart the order of the court of common pleas should be reversed and the order of the Pennsylvania Labor Relations Board reinstated. Contrary to the majority, I would also reverse the order of the court of common pleas and reinstate the Board's determination with respect to King, Graves and Myers.

***

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE EAGEN:

I concur in the ruling of the Majority except as it relates to the claim of Katherine King. I believe there was "substantial and legally" credible evidence from which the Board could properly infer that Hetelson directed Burton to fire Miss King.