Public Utilities Commission,
No. 5858.

### Boston & Maine Corporation

*v.*

### Manchester.

Argued May 6, 1969.
Decided September 30, 1969.

*Wiggin, Nourie, Sundeen, Nassikas & Pingree* and *W. Wright Danenbarger* and *John J. Nee* and *Chester A. Prior* both of Massachusetts (*Mr. John N. Nassikas* orally), for the plaintiff.

*J. Francis Roche,* city solicitor (by brief and orally), for the defendant.

Lampron, J. Appeal by the railroad under RSA ch. 541 from an order of the Public Utilities Commission issued July 30, 1968 and its denial of a motion for rehearing thereon.

Prior to January 20, 1961, crossings at West Central Street and Granite Street in Manchester were protected by manually operated gates and a man was stationed at each crossing throughout each 24 hour period. On that date, the Commission authorized the installation of automatic half-gates and lights at each crossing but superimposed manual control of these gates which was to be in charge of a tender at Granite Street who could operate the gates at both crossings. The Commission ordered that a tender be maintained on duty daily at Granite Street between 6 A.M. and 10 P.M. to operate the gates manually in anticipation of congested conditions and to eliminate false indications.

The railroad by its present petition, the order on which is the object of this appeal, and by a prior petition denied November 5, 1965, sought authority to eliminate the crossings tenders, (three being necessary to fill the required shifts), thus placing the protection at both of these crossings upon a fully automatic basis. After a hearing and findings, the Commission amended its order of January 20, 1961 and relieved the railroad from the obligation of maintaining a tender "on Saturdays, Sundays and Holidays."

There are two main tracks at both crossings with an additional industrial track at West Central Street. Train movements over these crossings consist of 8 on Mondays, Wednesdays and Fridays; 6 on Tuesdays and Thursdays; and 4 on Saturdays and Sundays. In addition there is a coal train which operates every sixth day in each direction. There are no scheduled train movements operating between the hours of 6 A.M. and 10 P.M. on Saturdays, Sundays and Holidays. The Commission found that there have been no substantial changes in the physical conditions at the crossings. It also found that the discontinuance of passenger train service as of June 30, 1967, has had no substantial bearing on the requirement for the crossing tenders.

A traffic count taken on Friday, December 8, 1967, at the Granite Street crossing showed that 84 school children, 897 other pedestrians, 19,431 automobiles, 1 school bus, 232 other buses, 2,129 trucks, 8 motorcycles and bicycles used the crossing between 6 A.M. and 10 P.M. During this 16 hour period, the heaviest automobile traffic occurred between 4 and 5 p.m. when 1,517 automobiles passed over the crossing. In comparison to a similar count on April 28, 1965, the 1967 count shows 63 less pedestrians and 223 less bicycles but an increase of 3,993 cars, 18 trucks and 28 buses.

There was testimony that Granite Street is a heavily traveled thoroughfare with an intersection immediately west of the crossing at Bedford Street, and an intersection a short distance east of the crossing at Canal Street. There was evidence that it is necessary to have a police officer at Canal Street during certain periods on week-days to expedite traffic which often backs up west of the crossing. There was further evidence that the city's planned installation of traffic lights at the intersection of Granite and Canal Streets would not alleviate this condition. There was also testimony by a crossing tender that there are many periods during the day when traffic on Granite Street is practically bumper

to bumper and that there are many occasions when the approach of trains is anticipated by the tender to avoid traffic being caught on the crossing when the gates are activated. Fire department officials testified that if the crossing tender is removed traffic will back up and block the crossing thus impeding the passage of their equipment.

The Commission found that the annual expense of maintaining the crossing tenders at the time of the hearing was $20,203.58 (which was reduced to about $15,500 under the new order) and that this expenditure would not constitute an undue burden on interstate commerce and that the railroad can afford the continuance of this service. "The records show that there have been no serious accidents at either Granite Street or West Central Street crossings since the installation of automatic signals with the crossing tender services superimposed thereon. This experience creates a reasonable inference that the present protection has performed very satisfactorily in the interest of public safety. The occurrence of serious accidents could be a much greater expense for the railroad, and most assuredly would not be in the interest of public safety . . . . "

"The Commission is of the opinion, and so finds, that the crossing protection at Granite Street is consistent with national standards, but also finds that without a crossing tender to superimpose manual protection, when density of traffic requires, and to eliminate false, or unnecessary, indications in the operation of the automatic protection, confusion, and disregard of this protection may result . . . . "

"The density of traffic at these crossings demands that the automatic and manual protection be coordinated to avoid serious accidents, and at times, requires an advance operation of signals to eliminate traffic from blocking the crossings."

The railroad claims the Commission erred in concluding that crossing tenders were required for public safety. We disagree. RSA 373:10 provides in part that "Every railroad shall . . . operate and maintain at every grade crossing of its railroad with . . . [a] highway such warning signs, gates or other protection . . . and it shall give such appropriate warning of the approach of its trains to any grade crossing as the commission, after notice and hearing, may find necessary in the interest of safety of the railroad or of the public . . . . " "Other protection" provided by tenders could properly be found necessary in the interest of

public safety to prevent motor vehicles at certain periods of the day from becoming lined up "bumper to bumper" across the crossing at train time "with a chance to get caught there." The Commission was not required to accept the railroad's contention that the control of traffic at its crossing was the responsibility of the city. The action of the crossing tender in trying to keep the cars from getting on the crossing after he had received the warning bell that a train was approaching and before the gates were automatically activated could properly be characterized by the Commission "an advance operation of signals to eliminate traffic from blocking the crossings."

"Other protection" by crossing tenders could also be found necessary in the public interest to eliminate the operation of the automatic crossing signals when for a considerable period of time trains are away from the crossing and not using it. The Commission with the general information and expert knowledge which it obtains in the performance of its day-to-day activities could properly conclude from this evidence that "a signal indication which is not followed immediately by a train movement over a crossing is an invitation to disregard that signal." *Pennsylvania Lab. Rel. Bd.* v. *Sand's Restaurant Corp.,* 429 Pa. 479; 2 Am. Jur. 2d, Administrative Law, *s.* 394. There was testimony from a railroad engineer that it was the duty of the present crossing tenders to control the signals to avoid false indications during switching moves. The Commission was not required to adopt the railroad's contention that this operation could and should be done by the train crew. We cannot hold on the record that the Commission's order that crossing tenders were required in the interest of public safety at the Granite Street crossing was unlawful or unreasonable. *White Mountain Power Co.* v. *Whitaker,* 106 N. H. 436.

The railroad maintains further that the Commission erred in failing to apportion between the railroad and the city the cost of continuing the crossing tenders at the Granite Street crossing.

RSA 373:10 provides in part that "cost of constructing or improving such warning signs, gates or other protection shall be apportioned in accordance with the provisions of section 3 of this chapter." The latter provides for apportionment of such costs between the railroad and the city if such crossing is located at the intersection of a railroad and a highway. RSA 373:3. It is to be noted that section 3 deals with apportionment of costs

of reconstruction (*s.* 2) when changes in the physical aspects of crossings are ordered. Similarly section 10 involved here provides for apportionment of the cost "of constructing or improving warning signs, gates or other protection."

We cannot say as a matter of law that the Commission erred in not apportioning those costs in this case. The Commission in its order pointed out that the shanty and necessary appliances and controls for the manual operation of the gates were installed voluntarily by the railroad. The Commission could properly rule that the obligation to keep the traffic off the crossing to permit the operation of the automatic gates with safety to the public was the obligation of the railroad and not of the city. Consequently it could impose all the manpower cost of the required tenders on the railroad.

*Appeal dismissed.*

All concurred.