Public Utilities Commission
No. 81-148

APPEAL OF THE CITY OF MANCHESTER
(New Hampshire Public Utilities Commission)

December 8, 1981

*Elmer T. Bourque*, city solicitor (*Charles W. Flower, Jr.*, assistant city solicitor, on the brief and orally), for the City of Manchester.

*Gregory H. Smith*, attorney general (*Peter C. Scott*, assistant attorney general, on the brief), by brief for the Public Utilities Commission.

*Gallagher, Callahan & Gartrell*, of Concord (*John B. Pendleton* on the brief and orally), for the Boston & Maine Corporation.

PER CURIAM. As a result of a double fatality at the West Mitchell Street crossing of the Boston & Maine Railroad tracks in Manchester on December 15, 1980, the public utilities commission (commission) conducted a hearing on January 2, 1981, to deter-

mine whether additional crossing protective devices were warranted. The hearing was prompted by a public statement made by the Mayor of the City of Manchester, followed by a letter and a petition signed by people living in the area of the crossing. Following the hearing, the commission by order of January 14, 1981, required that additional protective devices be installed at the crossing and ordered that the City of Manchester pay the entire cost of the protective devices, estimated at $93,750. We affirm.

The city was not given formal notice of the January 2, 1981, hearing, but the mayor of the city did appear at the hearing. Although at the hearing, the mayor supported the installation of the additional protective devices, he requested that the Boston & Maine Railroad bear at least part of the cost of the protective devices. After the commission denied this request, the city petitioned for a rehearing, which was granted. At the rehearing on February 13, 1981, the city objected to the following matters: that it did not receive a final notice of the first hearing; that it was not informed of exchanges of information between the railroad and the commission; that there was insufficient time between the granting of the rehearing and the rehearing itself; that the commission denied the city's motion for a continuance; and that the order of the commission apportioning one hundred percent of the cost of the additional protective devices to the city was unreasonable and unlawful because the commission improperly applied certain statutory criteria and failed to apply other criteria. From orders of the commission upholding its original decision, the city appeals by petition to this court pursuant to RSA 541:6.

The finding of the commission that the installation of certain automatic flashing lights and gates is an "appropriate warning . . . necessary in the interest of safety . . . of the public," RSA 373:10, is not disputed by the city. The city challenges only the apportionment of the costs of installing the automatic flashing lights and gates made pursuant to RSA 373:10 and argues that the one hundred percent allocation of costs to the city is unlawful and unreasonable.

█ Under RSA 373:10, the commission is directed to perform the apportionment in accordance with the provisions of RSA 373:3. The provisions of RSA 373:3 require the commission to give "due consideration" to each of following four factors:

"[1] whether the railroad or the highway was first constructed,
[2] . . . the nature and volume of highway traffic,

[3] . . . the number of trains operated by the railroad at the crossing, and

[4] all other relevant facts and circumstances."

*See Hanrahan v. City of Portsmouth*, 119 N.H. 944, 409 A.2d 1336 (1979) (factors to be "considered" in historic district zoning).

The railroad tracks were in operation sometime after 1830, over a century before the West Mitchell Street crossing was used. The West Mitchell Street crossing is the only access over the railroad to the Riverdale section of Manchester and was constructed in 1943. It replaced two crossings, the Smyth Ferry Road crossing and the Westland Avenue crossing. The Westland Avenue crossing, a private crossing, was paved and maintained by the city and was used by the public. The Smyth Ferry Road crossing, a public crossing, was improved but used less frequently by the public than the Westland Avenue crossing.

The commission found that the volume of highway traffic over the West Mitchell Street crossing had more than doubled between 1943 and 1980. The city does not agree with the characterization of this increase as "significant" and cites the case of *Boston & Maine Corp. v. Manchester*, 109 N.H. 521, 257 A.2d 14 (1969), where the commission apportioned the entire cost to the railroad even though there was an increase of over two hundred vehicles per day. In that case, the commission found an increase in vehicular traffic and a decrease in pedestrian and bicycle traffic over a two-and-one-half-year period. *Id.* at 522, 257 A.2d at 15. It also found that the discontinuance of passenger train service on the line just prior to the hearing had no bearing on the requirement for crossing tenders. *Id.* at 522, 257 A.2d at 15. The court sustained the apportionment, despite the fact that at least two of the standards, the increased vehicular traffic and the decreased train service, seemed to weigh in favor of apportioning some cost to the city. However, the court in that case cited as its reason for allocating the entire cost to the railroad the fact that the railroad had voluntarily installed the prior safety equipment.

In this case, the city does not dispute the commission's finding that about seventeen trains passed over the crossing daily in the 1940's but that only ten trains did so daily in December of 1980. The commission concluded that a decrease in the number of trains would weigh in favor of apportioning the costs to the city.

The determination by the commission that the West Mitchell Street crossing primarily replaced the Westland Avenue crossing is well supported by the evidence. Westland Avenue was paved while Smyth Ferry Road was not. In addition, Westland Avenue

carried most of the traffic. Finally, because the Smyth Ferry Road remains open on an emergency basis and Westland Avenue does not, the commission reasonably concluded that the West Mitchell Street crossing replaced the Westland Avenue crossing.

The city argues unreasonable action on the part of the commission in apportioning costs to the city because the speed of the railbus may have contributed to the tragic accident that prompted the proceedings. Although this point may have been rendered moot because the railbus no longer operated at the time of the commission's final decision, there was ample testimony that during the 1940's the trains in the area actually traveled as fast or faster than they do today. The former transportation director of the commission testified that the old passenger trains traveled at about fifty miles per hour across the West Mitchell Street crossing. The new railbus traveled at forty miles per hour through the area until the commission ordered its speed lowered to thirty miles per hour. Additionally, testimony was introduced to show that the freight trains of the 1940's traveled faster than those used in the area today.

The city contends that the railroad is the entity responsible for creating the danger at the crossing because the accident might have been caused by the design of the railbus. Any effect of the design and head lamp configuration of the railbus, or of the sudden introduction of a speeding railbus, on the accident is irrelevant because the railbus no longer operated at the time the commission made its final decision regarding allocation of the costs of installing protective devices.

■ Having considered the factors enumerated in RSA 373:3, the commission was not obligated to apply the "relative benefit standard" and apportion according to whether the city or the railroad would derive more benefit from the installation of protective devices. As this court stated in *Boston & Maine Corp. v. State*, 109 N.H. 547, 549, 261 A.2d 267, 269 (1969), the legislature did not intend to retain the "relative benefit" test of the former statute when it amended the statute in 1951. Rather, the "allocation of costs [is] properly governed by considerations other than those of relative benefit alone." *Id.* at 550, 261 A.2d at 269.

The commission has properly considered the factors stated in RSA 373:3. Although we might have allocated the costs differently, the commission's conclusion was not unreasonable or unlawful. Consequently, we uphold the decision of the commission and dismiss the city's appeal.

*Appeal dismissed.*