# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Schindler Elevator Corporation,     :
            Petitioner     :
                           :
         v.             :
                           :
Department of Labor and Industry,     :    No. 1139 C.D. 2022
            Respondent     :    Argued: September 11, 2023

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION BY
JUDGE COVEY                          FILED: October 18, 2023

Schindler Elevator Corporation (Schindler) petitions this Court for review of the Department of Labor and Industry (Department), Elevator Safety Board's (Board)[1] September 20, 2022 order[2] granting, with the same condition, variance petitions Schindler filed relative to its 3300 Series elevators (collectively, Petitions).[3] Schindler presents four issues for this Court's review: (1) whether the Board applied an incorrect standard of review; (2) whether the Board deprived Schindler of due process; (3) whether the Board arbitrarily and capriciously rejected Schindler's design based on subjective preferences; and (4) whether the Board created a de facto regulation prohibiting Schindler's design regardless of its safety.

---

[1] The General Assembly created the Board in Section 2214.1 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, added by Section 3 of the Act of June 28, 2018, P.L. 451, 71 P.S. § 574.1, effective as of August 27, 2018.

[2] The Board's order was mailed on September 23, 2022.

[3] The Board assigned the following numbers for Schindler's individual projects: MD-57891, MD-59733, MD-60605, MD-60606, MD-60611, MD-60612, MD-60614, MD-60615, MD-60619, MD-60627, and MD-60628. *See* Reproduced Record at 402a.

After review, this Court reverses the Board's imposition of the condition on the variances.[4]

In June 2022, Schindler filed the Petitions with the Board for variances regarding 11 projects, incorporating similar attachments in each of the Petitions that described the proposed compensatory features supporting the requests. Each of the Petitions sought 9 or 10 variances (depending on whether the individual elevator utilized a retractable pit access ladder) from several applicable requirements, but all of the Petitions contained the following relevant provisions:

> 2. A variance is requested from [S]ection . . . 2.1.3.1.2(b) of the [American Society of Mechanical Engineers (]ASME[)] A17.1a-2002[5] [(ASME Code)]to permit a governor without the need for an access door, provided the governor meets the requirements of [S]ections 2.7.4.5, and 2.7.6.3.4; 2.18.6.5 to 2.18.7 of the ASME 17.1-2016.[6]
>
> 3. A variance is requested from [S]ection[s] 2.7.5 and 2.7.6 of the ASME 17.1a-2002 to permit the Schindler drive machine to be installed and accessed in the hoistway as permitted and meeting all the requirements as applicable in [S]ection[s] 2.7.5 and 2.7.6 of the ASME A17.1-2016.

Reproduced Record (R.R.) at 54a.

On July 19, 2022, the Board held a hearing on the Petitions. Schindler presented testimony and supporting evidence for its variance requests. The Board denied the variance requests from Sections 2.1.3.1.2(b), 2.7.5, and 2.7.6 of ASME

---

[4] The International Union of Elevator Constructors submitted an *amicus curiae* brief in support of the Board's decision. National Elevator Industry, Inc. submitted an *amicus curiae* brief supporting Schindler's appeal.

[5] "ASME publishes an updated version of ASME 17.1 approximately every three years. https://www.asme.org/codes-standards/find-codes-standards/a17-1-csa-b44-safety-code-elevators-escalators-(1). However, the latest edition regulatorily adopted in Pennsylvania was originally issued in 2002." Bd. Br. at 4 n.3.

[6] "ASME A17.1-*2016* is a more-recently issued version of the ASME requirements, but . . . Pennsylvania regulations currently require conformance with ASME A17.1a-*2002*. 34 Pa. Code § 405.2(a)(1)." Bd. Br. at 7 n.5.

A17.1a-2002, but granted the remaining variance requests. On July 20, 2022, the Board issued orders for each of the 11 Petitions, based on the Board's July 19, 2022 oral vote (1) granting numerous variance requests, and (2) denying the following two variance requests:

> A variance from Section 2.1.3.1.2(b) of the ASME A17.1a-2002 to permit a governor without the need for an access door is denied.
>
> A variance from Sections 2.7.5 and 2.7.6 of the ASME A17.1a-2002 to permit the Schindler drive machine to be installed and accessed in the hoistway as permitted and meeting all the requirements as applicable in Sections 2.7.5 and 2.7.6 of the ASME A17.1-2016 is denied.

Board's July 20, 2022 Orders at 2 (R.R. at 368a-389a).

On July 29, 2022, Schindler filed a motion for reconsideration, and, at an August 16, 2022 hearing, the Board unanimously agreed to review its July 20, 2022 orders.[7] Schindler presented additional evidence and testimony concerning its variance requests. Board Member Joe Williams (Board Member Williams), who is an elevator mechanics union (Union) leader, participated extensively in the hearing, raising concerns about Schindler's proposed lack of a car blocking device, showing a PowerPoint presentation reflecting findings from an independent investigation he conducted into Schindler's elevator installations, and questioning Schindler's credibility. Schindler's counsel informed the Board that not a single reported incident had occurred involving the absence of a car blocking device. R.R. at 484a,

---

[7] On August 19, 2022, Schindler also filed a Petition for Review from the Board's July 20, 2022 orders in this Court. On August 26, 2022, the Board filed in this Court a Praecipe to Mark the Petition for Review as Stricken (Praecipe) under Pennsylvania Rule of Appellate Procedure 1701(b), Pa.R.A.P. 1701(b), in accordance with Section 35.241(f)(2)(ii) of the General Rules of Administrative Practice and Procedure, 1 Pa. Code § 35.241(f)(2)(ii), based on the Board's grant of reconsideration. Schindler did not oppose the Praecipe. On August 30, 2022, this Court notified the parties that it had stricken Schindler's August 19, 2022 Petition for Review.

491a. Further, Schindler representatives testified regarding Schindler's braking system's operation and redundancies. *See* R.R. at 493a-494a, 510a-515a.

On September 20, 2022, the Board issued an order granting all the variance requests subject to "the condition that physical, manually-operated car blocking devices are installed in each elevator." R.R. at 554a-556a. The Board's order also permitted Schindler to immediately install the elevators without the required car blocking device for a six-month period or until a court of competent jurisdiction issues a final, non-appealable order affirming or reversing the Board's decision. *See* R.R. at 554a-555a. The Board issued its written decision on September 23, 2022. Schindler appealed to this Court.[8]

Initially, Section 2214.1 of The Administrative Code of 1929 (Act) states, in relevant part:

> (a) The . . . Board is established and shall consist of the members as provided in this section.
>
> (b) The Governor shall appoint the members of the [B]oard with one representative from each of the following:
>
> > (1) The Department . . . .
> >
> > (2) An elevator manufacturing company.
> >
> > (3) An elevator servicing company.
> >
> > (4) An architectural design or elevator consulting profession.
> >
> > (5) An elevator inspector.

---

[8] "Our scope of review in this matter is limited to a determination of whether constitutional rights were violated, whether the decision was rendered in accordance with the law, and whether necessary findings of fact are supported by substantial evidence." *Bologna v. Pa. Dep't of Lab. & Indus.*, 816 A.2d 407, 410 n.3 (Pa. Cmwlth. 2003).

4

(6) A labor organization specializing in the installation, maintenance and repair of elevators and other conveyances.

(7) A building owner or manager.

(8) A municipality.

(9) The general public.

. . . .

(f)

. . . .

(3) The [**B**]**oard** **may** **grant exceptions and variances from the requirements of applicable codes and standards or regulations if the changes would not jeopardize the safety and welfare of the general public or individuals employed in the elevator industry**. The Department['s Bureau of Occupation and Industrial Safety (BOIS)] . . . shall accept applications for all exceptions and variances and **shall make recommendations on the applications to the** [**B**]**oard**.

(4) The [B]oard may hold hearings and hear appeals on matters relating to this section in accordance with regulations and procedures established by the [B]oard in consultation with the Department . . . .

71 P.S. § 574.1 (bold and underline emphasis added).

Section 405.2(a)(1) of Pennsylvania's Uniform Construction Code (UCC) adopts specific sections of "'ASME A17.1-2000' with 'A17.1a-2002' addenda" pertaining to "[e]lectric elevators[.]" 34 Pa. Code § 405.2(a)(1).

Section 405.3 of the UCC states, in pertinent part:

(a) An owner of an elevator or lifting device or an authorized agent shall apply to the Department for a permit before the construction, alteration, replacement[,] or repair of an elevator or lifting device.

5

. . . .

(g) An owner or owner's agent **may request a variance** or appeal the code administrator's decision to the Industrial Board[9] **under [Section] 403.122 [of the UCC]** (**relating to** appeals, **variances** and extensions of time). The appeal shall be based on a claim that the true intent of the [A]ct or the [UCC] were incorrectly interpreted, the [A]ct does not fully apply or an equivalent form of construction is to be used.

34 Pa. Code § 405.3 (emphasis added).

Section 403.122 of the UCC declares, in relevant part:

(a) An owner or owner's agent may seek a variance or extension of time or appeal a building code official's decision by filing a petition with the building code official or other person designated by the board of appeals on a form provided by the municipality.

. . . .

(d) A board of appeals[10] shall decide an appeal, **variance request** or request for extension of time by reviewing documents and written brief or argument unless the owner or owner's agent requests a hearing.

. . . .

(g) A board of appeals may consider the following factors when ruling upon . . . the request for variance:

---

[9] Prior to the Board's creation, the Industrial Board reviewed variance requests. In October 2018, the Board assumed such responsibility in accordance with Section 2214.1 of the Act.

[10] Schindler contends that Section 403.122 of the UCC is inapplicable because it refers to the authority of "[a] board of appeals[,]" 34 Pa. Code § 403.122, not the Board. It notes that "[a] 'Board of Appeals' is an agency created by a municipality 'to hear appeals from decisions of the [municipal] code administrator.'" Schindler Br. at 22 (quoting Section 403.121 of the UCC, 34 Pa. Code § 403.121). Notwithstanding, Section 2214.1 of the Act empowers the Board to grant variances. Section 405.3 of the UCC directs an owner or owner's agent to request a variance from the Industrial Board **under Section 403.122** of the UCC, which, until October 2018, had authority to grant variance requests. Because the Board is now statutorily authorized to grant such variances in place of the Industrial Board, this Court discerns no error in the Board's compliance with Section 405.3 of the UCC.

6

(1) The reasonableness of the [UCC]'s application in a particular case.

(2) The extent to which the granting of a variance or an extension of time will pose a violation of the [UCC] or an unsafe condition.

(3) The availability of professional or technical personnel needed to come into compliance.

(4) The availability of materials and equipment needed to come into compliance.

(5) The efforts being made to come into compliance as quickly as possible.

(6) Compensatory features that will provide an equivalent degree of protection to the [UCC].

. . . .

(i) The board of appeals may:

(1) Deny the request in whole or in part.

(2) Grant the request in whole or in part.

(3) Grant the request upon certain conditions being satisfied.

34 Pa. Code § 403.122 (emphasis added).

## I. **Standard of Review**

Schindler first contends that the Board erred by applying an incorrect standard of review that is inconsistent with the General Assembly's statutory mandate. According to Schindler,

> [t]he Board's enabling law provides that the Board **should** grant a variance if that variance "would not jeopardize the safety and welfare of the general public or individuals employed in the elevator industry." [] 71 P.S. § 574.1(f). This is a permissive standard, consistent with the ASME Code, that permits technical innovation and design as long as that design achieves the safety goals set forth in the

7

ASME Code.  **The Board**'**s role is to determine if a particular variance presents a safety risk and**, **if it does not**, **the variance should be granted**.

Schindler Br. at 19 (bold and underline emphasis added).

Notwithstanding Schindler's assertion, Section 2214.1(f)(3) of the Act states that "[t]he [B]oard **may** grant . . . variances[.]" 71 P.S. § 574.1(f)(3) (emphasis added).  The Pennsylvania Supreme Court has held:

> The regulations of the Pennsylvania Code specifically provide for the **discretionary** granting of . . . variances. The statutes and the [Pennsylvania] Code contemplate exercise of agency discretion in the granting of . . . variances . . . .  These discretionary decisions are exercised by the application of standards, rules[,] and regulations to the conditions and circumstances of the particular case.

*Petition of Dwyer*, 406 A.2d 1355, 1359 (Pa. 1994) (emphasis added; footnote and citation omitted).

Our Supreme Court has explained:

> "**Although** '**may**' **can mean the same as** '**shall**' **where a statute directs the doing of a thing for the sake of justice**, **it ordinarily is employed in the permissive sense**." *Commonwealth v. Garland*, . . . 142 A.2d 14, 17 n.5 ([Pa.] 1958) (internal citations omitted); *Commonwealth v. A.M. Byers Co.*, . . . 31 A.2d 530, 532 ([Pa.] 1943) ("The word 'may' clearly implies discretionary power.  The language is permissive, rather than mandatory."). *See also Bowser v. Blom*, . . . 807 A.2d 830, 835 ([Pa.] 2002) (where court "may" award costs and fees in child support proceeding, prevailing party is not automatically entitled to award); *Treaster* [*v. Union*, 242 A.2d 252, 255 (Pa. 1968)] (statute stating township "may revise its budget" during fiscal year should not be construed to mean township was required to do so); [Pennsylvania Rule of Appellate Procedure 2744,] Pa.R.A.P. 2744 (appellate court "may award as further costs damages as may be just" if appeal is frivolous). *Cf. In re Farnese*, . . . 17 A.3d 357, 370-71 ([Pa.] 2011)

([Pennsylvania] Election Code[11] provision stating court "shall" award costs "as it shall deem just" does not entitle prevailing party to automatic award; language "contemplates a more nuanced, calibrated decision, perhaps difficult, but not at all a strange matter for courts of justice").

Additionally, although th[e Supreme] Court has occasionally interpreted the word "may" in a statute as mandatory, [it has] done so "usually where the ends of justice or constitutional requirements so dictate." *Treaster*, 242 A.2d at 255. . . . **Unless there are similarly compelling reasons for interpreting "may" as "shall" . . ., the plain, permissive language in [the statute] leaves the decision . . . to the sound discretion of the tribunal**.

*A. Scott Enters., Inc. v. City of Allentown*, 142 A.3d 779, 787-88 (Pa. 2016) (emphasis added; footnote omitted).

Here, the Act does not direct the Board to approve a variance "for the sake of justice," *id*. at 787, nor are there "compelling reasons for interpreting 'may' as 'shall[,]'" *id*. at 788, especially where, as here, an administrative board consisting of individuals with special skills related to that administrative board's functions is charged in its discretion with rendering a decision. *See Troiani Grp. v. City of Pittsburgh Bd. of Appeals*, 273 A.3d 43 (Pa. Cmwlth. 2022). Rather, the decision to grant an elevator variance is left to the **Board's "sound discretion**[.]" *A. Scott Enters., Inc.*, 142 A.3d at 788 (emphasis added).

Nonetheless, in explaining its reasoning, the Board revealed that it reviewed the Petitions under a *stringent standard* regularly used in a zoning context, whereby a variance applicant must prove unnecessary hardship and demonstrate a "substantial, serious and compelling" reason for the variance request (Zoning

---

[11] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600 – 3591.

Standard).   Bd. Op. at 13; *see also* Section 910.2(a) of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S. § 10910.2(a).[12]

The Board stated:

> Here, Schindler is seeking permission to deviate from the current terms of the UCC[] requirements that are adopted

[12] Act of July 31, 1968, P.L. 805, *as amended*, added by Section 89 of the Act of December 21, 1988, P.L. 1329.  Section 910.2(a) of the MPC provides:

> (a) The [zoning] board shall hear requests for variances where it is alleged that the provisions of the zoning ordinance inflict unnecessary hardship upon the applicant.  The [zoning] board may by rule prescribe the form of application and may require preliminary application to the zoning officer.  The [zoning] board may grant a variance, provided that all of the following findings are made where relevant in a given case:
>
> > (1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.
> >
> > (2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.
> >
> > (3) That such unnecessary hardship has not been created by the [applicant].
> >
> > (4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.
> >
> > (5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2(a).

for public safety and codified by Department[] regulation. [*See*] *Com*[. *of Pa.*]*, Indus*[.] *B*[*d.*] *v. Durbin*, 354 A.2d 24, 26 (Pa. Cmwlth. 1976). Accordingly, appellate courts have held that the reasons for a review board "granting a variance must be substantial, serious[,] and compelling." *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, [] 462 A.2d 637, 640 (Pa. 1983). The party seeking the variance bears the burden of proving unnecessary hardship and absence of injury to the public interest. *Abe Oil Co. v. Zoning Hearing Bd. of Richmond Twp*., 649 A.2d 182, 185 (Pa. Cmwlth. 1994) [(]citing *Ventresca v. Exley*, 56 A.2d 210 (Pa. 1948)[)]. The applicant's burden for a variance request is heavy and review boards should grant variances to current requirements sparingly and only under exceptional circumstances. *Appeal of Lester M. Prange, Inc.*, 647 A.2d 279 (Pa. Cmwlth. 1994).

Boards should not grant variance requests simply because compliance with the current requirements deprives the owner of the most profitable uses of the property. *Wilson v. Plumstead T*[*wp.*] *Zoning Hearing B*[*d.*], . . . 936 A.2d 1061 ([Pa.] 2007). Reasonable financial considerations or economic issues are not pertinent to a board's analysis of a variance request.

Bd. Op. at 13-14; *see also* Bd. Op. at 30, Findings of Fact 5, 6.

Board elevator variance approvals are not uncommon.[13] Neither Section 2214.1 of the Act, nor Section 403.122 of the UCC, mandate or imply application of the aforementioned Zoning Standard.[14] Further, this Court has not

---

[13] In fact, the Board's Chairman acknowledged at the August 16, 2022 hearing that "the Board had . . . up until this point [] approved 425 variances . . . ." R.R. at 499a.

[14] In addition, the Board's standard "Elevator Safety Board Petition" form requires that the applicant furnish the following information with respect to the variance request:

• Section of code requesting variance(s).

• Detail what your alternative approach entails and any compensatory measures.

• State the reasons for the requested variance, including why the strict letter of regulation is **impractical**, how the variance would

11

found any prior court decision wherein the Board or the Industrial Board applied the Zoning Standard to elevator variance requests.[15] Given that neither the Act nor the UCC mandate or imply the Zoning Standard, the Board has not previously applied the Zoning Standard to elevator variance requests, and the Act's directive that the Board may grant a variance "if the changes would not jeopardize the safety and welfare of the general public or individuals employed in the elevator industry[,]" 71 P.S. § 574.1(f)(3), the Board erred by imposing the Zoning Standard when deciding the Petitions.[16]

## II. Due Process

Next, Schindler contends that the Board deprived it of due process by relying on Board Member Williams' improper and *ultra vires* investigation and allowing him to present his findings to the Board in a quasi-prosecutorial role. Specifically, Schindler contends that Board Member Williams

> used his position within the Union to either request or demand that an elevator mechanic grant him access to the elevator car tops and shafts in private property located in Philadelphia for the purpose of photographing Schindler's elevator components. [*See* R.R. at 488a-490a, 495a-

---

> satisfy the code's intent, and why the modification would not lessen health, life and safety requirements in the listed code section(s).

R.R. at 52a (emphasis added). Merriam-Webster defines "impractical" as "a: not wise to put into or keep in practice or effect[;]" "b: incapable of dealing sensibly or prudently with practical matters[.]" Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/impractical (last visited Oct. 17, 2023).

[15] In an analogous case, *Valimont v. Department of Labor & Industry, Industrial Board*, 667 A.2d 759 (Pa. Cmwlth. 1995), this Court concluded that the Industrial Board had properly denied a variance request from Section 58.21(a), (c) of the Fire and Panic Regulations, 34 Pa. Code § 58.21(a), (c), based on similar variance standards set forth in the relevant regulation. *See* Section 49.15 of the Department's regulations, 34 Pa. Code § 49.15 (relating to appeals to the Industrial Board). The Zoning Standard was notably absent from this Court's analysis.

[16] In its opinion, the Board also reasoned that "[f]or this Board to grant a variance to the current requirements, Schindler must demonstrate . . . that [it has] provided **a safer or as-safe alternative**." Bd. Op. at 24 (emphasis added). However, that is not the standard.

12

497a]. Moreover, [Board Member] Williams - presumably from the same technician - obtained Schindler's confidential maintenance documents that Schindler licenses to elevator owners. [*See* R.R. at 496a].

Schindler Br. at 40.

The record reflects that Board Member Williams, as an adjudicating Board member, significantly participated as an advocate at the hearings, narrating a PowerPoint presentation urging against Schindler's requested variances, and repeatedly expressing his opinion based on his own investigation that Schindler's representations to the Board were untruthful.

Initially, at the Board's July 19, 2022 hearing, Board Member Williams stated:

> So[,] this came to light because it is coming up across the country. Across the country . . . [e]levator [s]afety [b]oards have come to realize that Schindler took this locking bar out, out of product, they are not installing it anymore. I found out last week on Thursday[,] and as soon as I found out that it had been removed, that [Schindler wasn't] using it, I called [BOIS representative] Joe Marchioni and talked to him about it. And then sent a[n] email to [the Board's Administrative Officer] Traci [Willman (Willman)] to withhold these variances so [the Board] can have this discussion today. Other jurisdictions are doing the same thing. [This Board is] not the only state [board] that is questioning this. I mean I find it personally insulting the response that [Schindler] gave [the Board].
>
> . . . .
>
> So[,] this question is being brought up across the country in jurisdictions all across the country. [The Board is] doing [its] due diligence as a [s]afety [b]oard. The questions [sic] is **Schindler wasn't forthcoming with all this information**[,] **that** [**it**] **could have given all the information to the Department when** [**Schindler**] **ask**[**ed**] **for these variances**. **And it has been proven here today**, [**Schindler**] **did not do that**. Elevator Division doesn't have all the information. [**It is**] **being led**

13

**to believe by Schindler that [one doesn't] have to do any maintenance on these and nobody has to get up in that overhead. And no mechanic is going to be put in a dangerous situation and he can do all this without every [sic] performing maintenance. But yet, [the Board has] documents in front of [it] that contradict everything that [Schindler] said. It has happened in the past with Schindler. [Schindler hasn't] even --- and the last incident with the belts, [Schindler wasn't] even submitting the correct certificates for conformance. [The Board is] being asked [to] believe Schindler's interp[re]tation of a code. I don't believe [Schindler is] meeting the code.** That is why it is being discussed here. **[Schindler] need[s] to resubmit [its] variances and [the Board] will go through this again next week[,] or [Schindler] can put the safety devices back on the elevator and keep it safe and have an extra means of protection and suspension for the mechanic working in the overhead.** It --- if I can --- [the Board] had an issue with another company over a product that the Board thought was unsafe. That company went out and came to a --- the first agreement was, to make a change in the design that would appease the Board to keep [its elevators] safer. And then they continue to look for a way to make [its elevators] safer and to endure a product and twice they felt things to make it safer and the Board can move on to make sure the people are safe.

**Schindler wants to play a word game here and interrupt** [sic] **words and a different meaning and tell you that [it doesn't] need to do it. I [m]ean --- quite frankly the arrogance is sickening.**

R.R. at 438a-439a (emphasis added).

At the August 16, 2022 Board hearing, the following exchanges occurred:

[Board Member Williams]: Here is the PowerPoint. I want to ask Schindler about jobs that are already installed and has been [sic] installed.

[Schindler's Counsel Brian P. Downey (Downey)]: I don't mean to interrupt you, let me --- are you under oath,

14

because if you are testifying - I might want to be able to cross[-]examine you as you are acting as a witness.

[Board Member Williams]: What is that --- I am asking the Chairman, I am asking to put a PowerPoint up that I think it is important to the presentation --- to this hearing here.

[Board Legal Counsel Peter Von Getzie (Von Getzie)]: These are the rules of the Board Member, and he started taking his oath back on October 16th, 2018.

[Downey]: We --- we --- I know, are able to cross[-]examine him in that role of any factual representation here ---

[Von Getzie]: Yes, you can ---

. . . .

[Downey]: . . . We object --- we were given a description of what he has given of this --- what he is about to offer is well beyond the scope of what this [B]oard is authorized to do. He provided --- an individual investigation by Board Members that are targeting Schindler that we see over and over and over here. [This Board Member's actions are] [*ultra vires*] and are well beyond what this Board is authorized to do and well beyond the role that any individual member can take or potential of taking within the process. I object at this point.

[Board Member Williams]: . . . **Here [are] the diagrams that come in the installation manual for Schindler for 3300**, **the car blocking device**. Here is the next one, just the installation diagrams for installing a car blocking device on the 3300. Next one, same diagrams. Here --- here is a picture of a Schindler 3300 car blocking device. This is installed --- **Schindler wants you to believe that it is extremely difficult and financially prohibitive to retro fit or install these on [its] units**, **but they are already installed**. They have been installed. These are units --- elevators that have [sic] installed in Philadelphia. Go to the next one. There is the piece that goes on the rail, the piece --- the pin goes into to secure the car. Schindler equipment --- here is the picture of the brake. The Schindler brake, it seems to be under question. That [Schindler] tell[s] [the Board] that there is no maintenance

15

. . . required on that. Go to the next one please. Right on the brake, [Schindler] is giving instructions on how to check the brake. I don't know what [Schindler] defined as maintenance, but brake inspection --- [Schindler is] telling [the Board] how to inspect it right on the brake, which is the same thing on the picture.

R.R. at 487a-488a (emphasis added).

[Board Member Williams]: And they are --- they are being installed. **This is from a job. One job is** [sic] **just done a month ago in Philadelphia and the other job is under construction right now**. So[,] **I just want the Board to see** --- **even though Schindler under oath told** [**the Board**] **that** [**it**] **can't retro fit or it is very difficult to retro fit** --- **there is no need to retro fit**. [**The elevators**] **are already designed and engineered to have this equipment on it**. I just want to go through the pictures, pretty simple stuff. Any experienced elevator mechanic can put that on in about an hour. . . .

R.R. at 489a (emphasis added). Board Chairman Scott Weiant then asked the Board members if they had any questions related to Board Member Williams' presentation. Several Board members asked questions regarding the need for and the process for installing car blocking devices, in response to which Board Member Williams continued:

[Board Member Williams]: So I wasn't finished with my PowerPoint yet. I still have more pictures of that. Here is the picture of the lock and block[] device on a [Schindler Series] 5500. That is --- you can see the pin going through. I just want everyone to see --- these are jobs in Philadelphia. I didn't go to California to get pictures. **Nobody sent me these. I went out to the job site in Philadelphia**[.] Here the plate goes on the rail --- that is pin[s] through the rail, two pins. The next one, this is just some overhead pictures of the machine. Just so the Board and anybody that is on sees or doesn't have experience on these machines. This is what the mechanics are dealing with in the overhead. There is the picture of the machine with the belts. And --- by the way **that is the machine that Schindler wants** [**the Board**] **to believe that**

16

**requires no maintenance**. Next picture please. Pretty tight --- up --- I am still talking there [Schindler Elevator Representative Norman Martin (Martin)].

[Martin]: Yes, but I would like to respond regarding no maintenance. That is not a fair comment.

. . . .

[Board Member Williams]: . . . . Okay, so question that I have for Schindler, **this isn't a question**. <u>**I am just going to make some statements**</u>. [**Schindler is**] **telling** [**the Board**] **there are no maintenance** [sic] **be done on these brakes**. **Yet** [**Schindler**] **sent** [**the Board**] **pictures and** [**the Board has**] **seen pictures here**. **And** [**Schindler is**] **asking a mechanic to go into the overhead with a Filler** (phonetic) **gauge to check the outer back of the brake**. Okay[,] so that is on top of the car and working on top of the car as their work platform --- working. **And** [**Schindler**] **want**[s] [**the Board**] **to believe that the brake should never fail**. **I don't know how** [**Schindler**] **can say never**. **I have been in this business 40 years and I have seen a lot of things happen**. **I have seen a lot of brakes fail** and there is [sic] a lot of different conditions and every shaft that could cause brakes to fail. **Schindler is telling you that they will never fail**, **and they don't require any maintenance**, even though and I will present this is a --- in the PowerPoint, I don't think [Willman] got it. But here is [Schindler's] Maintenance Control Program which is supposed to be left on every job. And you read through the Maintenance Control Program there is [sic] procedures and maintenance check that [Schindler is] requiring mechanics to do on brakes and on the machine and on the motor, and up on the overhead, on the top of the car as their work platform. And [Schindler is] basing everything on that theme could never be anything done [sic] that could cause unattended motion. How can anybody predict that. **You can't predict that a piece of machinery won't fail**. **And I think every bit of redundancy that we can have on an elevator to protect the mechanic or inspector in that overhead is needed**. There is not an [sic] enough recovery. **And when** [**Schindler**] **tell**[s] [**the Board**] **that the stop switch is enough**, **and the inspection switch is enough to remove it and not let it have any unattended motion**, **is just not**

17

**true**.  There is a possibility that the brake can fail.  All of us that have worked on elevators and have actually worked on elevators know that there are a million things that can go wrong that could affect the elevator machine motor and brake.  But when you put that lock and block, car blocking device in place, there is no chance that car is going to move unattended in the up direction.  The stop switch is not an [sic] enough. . . .  **So**[,] **I am asking the Board to do what is safe for anybody working inside of that hatch and require Schindler with the car blocking device on all of their** [**machine-room-less elevator systems**].  That is the safest thing to do --- yeah, it is probably a little bit redundant, but redundancy is a good thing when you are talking about a man's life or a wom[a]n's life or not losing your finger or your arm and crashing your head into the machine and the overhead.  Because even the slightest bit of unattended motion on an elevator can kill someone. That is more important than saving block for Schindler [].

R.R. at 495a-497a (bold and underline emphasis added).

[Board Member Williams]: . . .  No one can guarantee 100% that the brakes are not going to fail.  We all under --- I am assuming everyone here --- I understand how the enable switch, the stop switch --- whatever you want to call it, I get how safety circuit works.  And it takes power away and brakes are not going to pick --- but you can't guarantee that something couldn't happen to cause that brake to fail.  **And I am going to disagree with Schindler** --- **you are not meeting all the requirements of** [**Occupational Safety and Health Administration**] **for a lock out**, **tag out**, **just putting the stop switch on**, **does not remove the stored energy**.  **Yeah**, **the brake is set**, **that brake**[] **fails**, **nobody can guarantee that it wouldn't** --- **you need something else to make sure the car doesn't move**.  And that is what the lock and block does, it is removing the stored energy from the elevator, the car is not going to go up unattended.  We are talking about unattended motion.

R.R. at 505a-506a (emphasis added).

[Board Member Williams]: So[,] everything this gentleman --- sorry I don't remember his name, the one

18

that was just talking.  A lot of this stuff is independent, **I don't think it meets the code**.

(Cross talking)

[Board Member Williams]: Car top -- we all know there is maintenance that has to be done up there.  The emergency brake, the normal brake are not independent means to stop the car from possible unattended motion.  **Nobody can guarantee there is not going to be a failure**.  The stop switch is not an independent means, the lock and block, car locking device --- independent means, separate from the elevator driving machine brake, [e]mergency brake, motion controller, motor controller.  **So**[,] **I don't know if I can do this** --- **I would like to just add a provision to the variance request**, can I do that at this point so we can ---[.]

R.R. at 516a-517a (emphasis added).

The law is well established:

**The basic due process requirement that there be a fair trial before an impartial tribunal is applicable to administrative tribunals as well as to courts**.  **Potential dangers exist** when there is a **commingling of the investigative**, **prosecutorial**[,] **and adjudicative functions**.  [This Court has] recognized that the **due process requirement of a fair trial is violated when these functions are commingled** in a single individual and that due process may be violated when these functions are performed by different individuals within the same administrative entity.  The test in the latter situation is whether the functions performed are adequately separate so that there is no *actual* prejudice.

*Georgia-Pac. Corp. v. City of Reading Comm'n on Hum. Rels.*, 585 A.2d 1166, 1169

(Pa. Cmwlth. 1991) (bold emphasis added; citations omitted); *see also Purcell v.*

*Reading Sch. Dist.*, 167 A.3d 216 (Pa. Cmwlth. 2017).

The *Georgia-Pacific* Court observed:

The law recognizes a due process violation for the commingling of adjudicative and prosecutorial functions . . . .

19

> The role of the prosecutor is to fashion as strong a case against the accused as the evidence will allow. **This is manifestly at odds with the impartiality required of the adjudicator**. **When the prosecutor as an individual is permitted in some manner to fulfill the role of the fact-finder one of the necessary elements of a fair trial is lacking**.
>
> *Bruteyn Appeal*, . . . 380 A.2d 497, 501 ([Pa. Cmwlth.] 1977). **Since the fact-finding function is critical** to resolution of administrative cases, and is only subject to limited appellate review, **it is imperative that the process "be afforded the broadest dimensions of constitutional protection**." *P*[*a.*] *Hum*[*.*] *Rel*[*s.*] *Comm*[*'n*] *v. Thorp, Reed & Armstrong*, . . . 361 A.2d 497, 501 ([Pa. Cmwlth.] 1976).

*Georgia-Pac.*, 585 A.2d at 1170 (emphasis added).

In *Purcell*, this Court referenced the Pennsylvania Supreme Court's decision in *Lyness v. State Board of Medicine*, 605 A.2d 1204 (Pa. 1992). The *Purcell* Court recounted:

> "What our [Pennsylvania] Constitution requires," reasoned the Supreme Court, ". . . is that if more than one function is reposed in a single administrative entity, walls of division [must] be constructed which eliminate the threat or appearance of bias." [*Lyness*, 605 A.2d] at 1209. The Supreme Court's concern was not any demonstration of actual bias; rather, "**the potential for bias and the appearance of non-objectivity is sufficient to create a fatal defect under the Pennsylvania Constitution**." *Id*. at 1210. Finally, [our] Supreme Court cited its decision in *Gardner v. Repasky*, . . . 252 A.2d 704, 706 ([Pa.] 1969), when it noted proverbially, "**A man cannot sit as judge when he is a member of a board which has brought the accusations**." [*Lyness*,] 605 A.2d at 1208.

*Purcell*, 167 A.3d at 223 (emphasis added).

Here, the record reflects that Board Member Williams acted not as a neutral adjudicator but, in effect, in a prosecutorial capacity, conducting his own

20

investigation, preparing and presenting a PowerPoint presentation, revealing Schindler's internal documents and Board Member Williams' personal observations of Schindler's elevators, challenging the veracity of Schindler's representations, and advocating against the requested variances.[17] Further, such investigation and questioning led other Board members to similarly question Schindler. Board Member Williams, a sitting Board member who was also adjudicating the matter, engaged in egregious conduct, unconstrained by the Board, that deprived Schindler of an impartial tribunal and, thus, denied Schindler the due process to which it was entitled.

### III. Abuse of Discretion and Capricious Disregard

Schindler next asserts that the Board arbitrarily and capriciously rejected Schindler's design based on subjective preferences despite record evidence that Schindler's design is as safe or safer than a car blocking device. Schindler argues that there was no evidence regarding any legitimate safety concern on which

---

[17] In its opinion, the Board attempts to minimize the impact of Board Member Williams' role, explaining:

> [Board Member Williams] also provided the Board with documents purportedly from Schindler's maintenance program. Schindler objected to the Board admitting these documents into the record. At the August hearing, [Board Member Williams] provided additional PowerPoint presentations that included pictures of Schindler's 3300 Series equipment, pictures of the 5500 Series, and a maintenance control program document for the 3300s . . . . Schindler also objected to admitting these documents into the record. However, the admissions and objections concerning these exhibits are rendered moot because the Board did not consider or rely on these documents for [its] decision. Instead, the Board reached [its] conclusions based on [its] concerns involving the inherent safety issues discussed herein of technicians performing tasks while on a car top.

Bd. Op. at 20 n.8 (citations omitted).

21

the Board could have based its denial but, rather, the Board acted on its subjective preferences. Schindler asserts:

> The Board does not have *carte blanche* to deny variances for any reason whatsoever, including the subjective preferences of individual members. The Board's enabling legislation limits its authority and grants the Department the first review of any incoming variance petitions - the clear inference being that the Board should defer to the Department's expertise and diligent review unless it identifies a legitimate safety concern that would "jeopardize the safety of the general public" or technicians. [] 71 P.S. § 574.1(f)(a). Again, the Board's actions here were a stunning departure from its normal practice of granting petitions for variances unless specific, articulable safety concerns were identified.

Schindler Br. at 25.

"Our precedent states as a general rule that [a decision] 'is arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which [it] may be logically based.'" *Const. Drive Partners, L.P. v. Dep't of Env't Prot.*, 247 A.3d 1198, 1211 (Pa. Cmwlth. 2021) (quoting *Cary v. Bureau of Pro. & Occupational Affs., State Bd. of Med.*, 153 A.3d 1205, 1210 (Pa. Cmwlth. 2017) (en banc)).

> The Board made the following pertinent factual findings:
>
> 9. For an elevator with a traditional mechanical room, technicians have access to the machinery and brakes without having to be on top of or underneath the car. [*See* R.R. at 407a].
>
> 10. The design of the Schindler 3300 Series, which cuts the power to an elevator's motor and engages the brakes while a technician performs maintenance or inspection services, does not completely eliminate potential energy from the elevator or the possibility of the car unexpectedly moving. [*See* R.R. at 410a-414a, 424a, 427a-428a, 432a, 436a].

11. While a technician is working on an elevator, conditions are often unpredictable and can become dangerous, resulting in unexpected events that can cause severe injuries and even fatalities. [R.R. at 410a-413a, 496a, 516a, 523a].

. . . .

12. Schindler requests to install the subject 3300 Series elevators without including car blocking devices, also known as "lock and blocks," to further mitigate unexpected vertical car movement. [*See* R.R. at 19a-23a, 403a-404a].

13. A car blocking device is installed on some elevator models to physically prevent unexpected movement of the elevator while a technician is performing maintenance or inspection services from the car top. [*See* R.R. at 404a].

14. A technician must manually engage a car blocking device. [*See* R.R. at 404a].

15. Schindler has provided car blocking devices on other elevator models. [*See* R.R. at 403a, 417a].

16. Schindler installs car blocking devices for the 3300 Series elevators in California. [*See* R.R. at 404a-406a, 484a, 493a, 528a-529a].

17. Schindler has previously installed car locking devices on these models in other jurisdictions too, including Pennsylvania. [*See* R.R. at 403a-404a, 484a, 493a].

18. In some instances, Schindler admits it has chosen to placate a local authority's concerns about its elevators' design that omit the lock and blocks and installed the devices to avoid delaying an elevator installation project's progress. [*See* R.R. at 405a-406a, 493a-494a, 529a].

19. Using a car blocking device physically stops the elevator from moving unexpectedly during maintenance and inspection. [*See* R.R. at 428a].

Bd. Op. at 10-11.

In reaching its decision, the Board declared:

**From our own experiences**, the Board finds that Schindler's assertion that its design adequately removes stored energy and sufficiently prevents unexpected car movement is not credible. The Board also disagrees with Schindler's averment that using both the Schindler design and a car blocking device will not make it safer for technicians working on top of the car. [The Board] actually embrace[s] and encourage[s] Schindler's concept of "wearing a belt and suspenders" analogy. The Board favors the redundancy of additional safety measures, especially one such as a car blocking device because it is independent of the main power and braking system. Using both systems together sufficiently assures the Board that the car will be physically stopped from moving while technicians are working on top of that elevator.

Bd. Op. at 28 (citations omitted; emphasis added).

This Court has explained:

It has long been acknowledged that "those persons who comprise the membership of the various administrative boards have been selected for the special skills and requisite expertise they possess in order to properly render an independent judgment." *Batoff v. State Bd. of Psych.*, 750 A.2d 835, 841 (Pa. 2000). "Pennsylvania courts have consistently respected that administrative agencies comprised of persons presumably selected for their specialized experience and expertise are better qualified than any court to make a factual finding on a subject within their field." *Id.* "When an administrative agency rests its conclusion upon its expertise, courts generally respect its special competence." *No. 1 Cochran, Inc. v. Unemployment Comp. Bd. of Rev.*, 579 A.2d 1386, 1391 n.5 (Pa. Cmwlth. 1990).

The Supreme Court of this Commonwealth has recognized the special skills and expertise possessed of those people comprising the membership of its various administrative agencies. In *Pennsylvania Labor Relations Board v. Sand's Restaurant*

24

*Corp.*, . . . 240 A.2d 801 ([Pa.] 1968), the Supreme Court stated:

> []An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. **One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration**. . . [.] In these cases, we but restated a rule familiar to the law and followed by all fact-finding tribunals - that **it is permissible to draw on experience in factual inquiries**.[]

> *Id*. at . . . 805 (quoting in part from *Republic Aviation Corp. v. Nat*[*'l*] *Lab*[.] *Rel*[*s.*] *B*[*d.*], 324 U.S. 793, 800 . . . (1945)).

*Kundrat v. State Dental Council & Examining Bd.*, 447 A.2d 355, 358 (Pa. Cmwlth. 1982) (emphasis added).

Other decisions similarly recognize special deference to such boards/commissions. *See, e.g.*, *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n*, 926 A.2d 908, 915 (Pa. 2007) ("[T]he [c]ommission has special expertise and judgment in making licensing decisions." (quotation marks omitted)); *Rector Church Wardens v. City of Phila. Hist. Comm'n*, 215 A.3d 1038, 1042 (Pa.

25

Cmwlth. 2019) (recognizing the Philadelphia Historical Commission's "expertise given its mandated composition of specialists in historical, architectural, and real estate fields[]"); *Turchi v. Phila. Bd. of License & Inspection Rev.*, 20 A.3d 586 (Pa. Cmwlth. 2011) (deference afforded where Philadelphia Historical Commission composed of members with specialized knowledge, background, and expertise in the area of historic preservation); *Morelli v. Fire Code Bd. of Appeals*, 559 A.2d 90, 92 (Pa. Cmwlth. 1989) (affirming a Fire Code Board of Appeals' decision because "it is the [b]oard which has the expertise, and we will not interfere with the [b]oard's determination unless found to be arbitrary and capricious, or unsupportable on any rational basis"); *Coder v. State Bd. of Chiropractic Exam'rs*, 471 A.2d 563, 571 (Pa. Cmwlth. 1984) ("[D]ecisions of the Pennsylvania Supreme Court accord[] broad administrative discretion to public agencies in carrying out the functions conferred upon them by statutes which the legislature has necessarily been required to word in broad terms, in deference to the agency expertise needed to function in a specialized field."); *Swartwood v. Dep't of Env't Res.*, 424 A.2d 993, 996-97 (Pa. Cmwlth. 1981) ("[I]n the absence of a purely arbitrary exercise of an agency's duties or functions, we may not substitute judicial discretion for administrative discretion in matters, such as these, which involve technical expertise and which are clearly within the special knowledge and competence of the members of the [Environmental Hearing] Board.").

*Troiani Grp.*, 273 A.3d at 55-56 (footnote omitted); *see also Cnty. of York v. Indus. Bd. of Dep't of Lab. & Indus.*, 401 A.2d 885 (Pa. Cmwlth. 1979).

Nevertheless,

an agency's administrative expertise does not relieve it of the obligation to make factual findings "supported by the substantial and legally credible evidence." [*Sand's Rest*[.] *Corp*[.], . . . 240 A.2d at 805. Administrative expertise can be used to resolve conflicts in the testimony and to draw reasonable inferences from the facts of record. However, **an agency cannot use the specialized knowledge of its administrators as a substitute for evidence**. Neither *Kundrat* nor *Batoff* gives a green light to an agency's use of information known to the adjudicator as a basis for fact-

26

finding. To do so would deprive a respondent . . . of the opportunity to examine the evidence and "parry [its] effect" with rebuttal evidence to show why the agency's information is either wrong or not relevant. *Ohio Bell* [*Tel. Co. v. Pub. Util. Comm'n of Ohio*], 301 U.S. [292,] 302 [(1937)]. Further, it denies appellate courts the ability to determine whether an agency's factual findings are supported by substantial evidence.

*Kyu Son Yi, DVM v. State Bd. of Veterinary Med*., 960 A.2d 864, 872 (Pa. Cmwlth. 2008) (emphasis added; citations omitted).

> Information known personally to administrative officers must be disclosed and put on the record
>
> > *so that the supposed fact may be supplemented*, *explained*, *or refuted by contrary evidence*, and so that a court, on judicial review, may be informed of what facts the agency has utilized, so as to determine the existence of evidence in support of the decision.
>
> *Pub*[.] *Util*[*s.*] *Comm*[*'n*] *v. Cole's Express Re: Motor Common Carrier Rate Increases* [*&*] *Decreases*, . . . 138 A.2d 466, 498 ([Me.] 1958) (quoting 42 AM. JUR. *Pub*[.] *Admin*[.] *Law* § 130).

*Kyu Son Yi*, 960 A.2d at 870.

Schindler asserts that it submitted "overwhelming evidence[,]" including expert testimony, that its design was safe. Schindler Br. at 32. According to Schindler, the Board ignored this evidence and adopted the Board's personal preferences regarding necessary safety precautions. The Board approved all variances Schindler requested, but imposed the car blocking condition in each of the Petitions despite the lack of evidence demonstrating such a need.

It is unclear the extent to which the Board's erroneous application of the Zoning Standard affected its fact-finding and its reasoning when it imposed relative to each of the Petitions "the condition that physical, manually-operated car blocking devices are installed in each elevator." R.R. at 555a. Nor can this Court

27

fully discern the effects of Board Member Williams' improper investigation and participation on the Board's fact-finding and disposition of this matter. Based upon Board Member Williams' PowerPoint presentation and the accompanying information, other Board members inquired further about the material that Board Member Williams presented. Thus, it is clear that the Board based its finding that Schindler was not credible, at least in part, on Board Member Williams' assertions and questions stemming therefrom. Further, the Board's use of information arising from its own voting member's investigation and related questions was arbitrary and capricious conduct and deprived this Court of the ability to determine whether the Board's factual findings are supported by substantial evidence. Because the entire Board participated in the hearing and was privy to information Board Member Williams presented, a remand would serve no purpose beyond placing the matter before the very same body that was tainted by Board Member Williams' improper participation. Thus, this Court must reverse the Board's decision to the extent that it imposed on the Petitions' approval "the condition that physical, manually-operated car blocking devices are installed in each elevator." R.R. at 554a-556a.

For all of the above reasons, the Board's order is reversed to the extent that it conditioned its approval of the Petitions on Schindler installing physical, manually-operated car blocking devices in each elevator.[18]

_____
ANNE E. COVEY, Judge

---

[18] Given this Court's disposition of this matter, it does not reach Schindler's final issue.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Schindler Elevator Corporation,  :
     Petitioner  :
          :
    v.      :
          :
Department of Labor and Industry, :  No. 1139 C.D. 2022
     Respondent  :

## O R D E R

AND NOW, this 18th day of October, 2023, the Department of Labor and Industry, Elevator Safety Board's (Board) September 20, 2022 order is REVERSED to the extent that it conditioned its approval of Schindler Elevator Corporation's (Schindler) variance petitions for its 3300 Series elevators, Board designated as MD-57891; MD-59733; MD-60605; MD-60606; MD-60611; MD-60612; MD-60614; MD-60615; MD-60619; MD-60627; and MD-60628, on Schindler installing physical, manually-operated car blocking devices in each elevator. The Board's order is otherwise affirmed.

_____
ANNE E. COVEY, Judge